On Application for Rehearing
PARKER, Justice.
This Court’s opinion of February 17, 2012, is withdrawn, and the following is substituted therefor.
Amy Hamilton, individually and on behalf of her stillborn son, sued Dr. John Blakely Isbell, Dr. Steven Coulter, Dr. Warren Scott, and the Isbell Medical Group (“IMG”) (Dr. Isbell, Dr. Coulter, Dr. Scott, and IMG are hereinafter sometimes referred to collectively as “the defendants”), as well as several fictitiously named defendants, claiming that their negligent and wanton acts had wrongfully caused the death of her son and also caused her to suffer emotional distress. The DeKalb Circuit Court entered a summary judgment in favor of the defendants, holding that a wrongful-death action could not be maintained for the death of an unborn child who died before he was viable. The trial court also held that Hamilton’ was not in the- “zone of danger” and, thus, could not recover damages for emotional distress. We reverse in part, affirm in part, and remand.

Facts and Procedural History

A. Hamilton’s pregnancy and medical care

[1]

In December 2004, Hamilton, pregnant with her second child, sought prenatal care from IMG, which had provided Hamilton with prenatal care during her first pregnancy. On Monday, January 10, 2005, Hamilton contacted IMG; she explained that she and her seven-year-old son had a rash that she believed might be “fifth disease,” an infection caused by human parvo-virus B19. The next day, January 11, 2005, Hamilton had blood drawn at IMG and was told that she would be notified of the results. On Friday, January 14, 2005, an IMG employee told Hamilton over the telephone that Hamilton “had been exposed to fifth disease and had the parvovi-rus” and that, consequently, she needed to immediately schedule an ultrasound, to be followed by an ultrasound every 2 weeks *730 for the next 10 weeks. Hamilton understood this every-two-weeks ultrasound schedule to have been ordered by Dr. Is-bell; Dr. Isbell confirmed this in his deposition.
On Monday, January 17, 2005, Hamilton went to IMG for the first scheduled ultrasound as well as a consultation regarding treatment for fifth disease. However, the doctor with whom Hamilton was scheduled to meet was unavailable; Hamilton was also unable to undergo the scheduled ultrasound because the technician was leaving early. Hamilton’s request that she be sent to the adjoining hospital for an ultrasound was denied by an IMG employee; instead, she was told to wait for her next appointment two weeks later.
Hamilton returned to IMG two weeks later, on Monday, January 31, 2005; during the appointment, the doctor she met with, Dr. Coulter, listened to the unborn child’s heartbeat and told Hamilton that an ultrasound was unnecessary. He also explained to Hamilton the potential complications of fifth disease and the procedure for potential treatment of her unborn child, if necessary.
On February 18, 2005, Hamilton returned to IMG for her next scheduled appointment; she again requested an ultrasound, but the doctor she met with, Dr. Scott, said that an ultrasound was unnecessary.
On February 25, 2005, Hamilton returned to IMG for her next scheduled appointment, at which an ultrasound was performed. During the ultrasound, IMG’s technician noticed that Hamilton’s unborn son was not as large as the technician thought he should be at that stage of the pregnancy and that there was “a little fold at the back of his neck which worried [the technician] a little bit because it might be a sign of anemia.” The technician told Hamilton “not to be alarmed because [she] would probably be referred to a perinatol-ogist for a second opinion” and that treatment, if any was necessary, would be available at “Kirklin Clinic.”
Following the ultrasound, Hamilton met with Dr. Scott, who looked at still photographs from the ultrasound. Dr. Scott told her that a “nuchal fold [was] beginning to form” and that the nuchal fold “was one of the signs of becoming severely anemic and having hydrops,” which, he said, “can lead to congestive heart failure.” However, Dr. Scott told Hamilton that hy-drops “can reverse itself’ and that Hamilton should wait two weeks and return to IMG for another ultrasound. Hamilton requested that Dr. Scott refer her to “a perinatologist at Kirklin Clinic,” but Dr. Scott told her that IMG could “handle it” at its office. Instead, Dr. Scott told Hamilton to come back in two weeks for another ultrasound, and he promised to refer Hamilton to a perinatologist at that point, if necessary.
Eleven days later, on March 8, 2005, Hamilton -visited IMG without a scheduled appointment because she was feeling ill. In her deposition, Hamilton described how, after she tested positive for the flu, Dr. Scott “prescribed Extra Strength Tylenol for body aches, pain, and fever, because he said with that particular situation, there’s nothing you can do, you just have to wear it out.” Hamilton summarized her symptoms as an “acute illness.”
On March 10, 2005, Hamilton returned to IMG; as she explained in her deposition, she was “feeling really bad” and “seemed to be getting worse.” She had also noticed “decreased movement” of her unborn child. An ultrasound performed by IMG determined that Hamilton’s unborn son had died, probably in the previous 24 or 48 hours; labor was induced, and the child was stillborn on March 11, 2005. *731 Dr. Isbell, Dr. Coulter, and Dr. Scott agree that Hamilton’s unborn son had not reached viability, which is to say that, if her son had been born alive on that date, he was unlikely to have survived outside the womb.

B. Hamilton’s litigation

On April 28, 2006, Hamilton filed a complaint in the trial court, alleging that the defendants had caused the death of her unborn son “and that the death of her unborn son was wrongful within the meaning of the Alabama Wrongful Death Act, Ala.Code § 6-5-410 (1975).”[2] Hamilton later amended her complaint to allege that the defendants’ negligence had caused her to suffer “mental anguish and emotional distress.”
After completing discovery, the defendants filed a summary-judgment motion on June 7, 2009, arguing that this Court’s decisions in Gentry v. Gilmore, 613 So.2d 1241 (Ala.1993), and Lollar v. Tankersley, 613 So.2d 1249 (Ala.1993), did not permit a wrongful-death action where a previable child died before birth: “The Supreme Court of Alabama has held that a plaintiff cannot maintain a wrongful death action for a fetus not viable to live outside of the womb.... As such, summary judgment must be granted on behalf of the Defendants in regard to the wrongful death claim of the fetus.” The defendants also argued that Hamilton could not recover damages for her emotional distress because, they said, she had not shown either that she had sustained physical injury or that she was placed at risk of immediate physical harm by the defendants, as required by this Court in AALAR, Ltd. v. Francis, 716 So.2d 1141 (Ala.1998). The defendants stated that Hamilton “failed to demonstrate that she was in the ‘zone of danger’ as required by Alabama law.”[3]
Dr. Isbell and Dr. Coulter separately moved for a summary judgment; Dr. Is-bell argued that Hamilton had presented no argument or evidence to show that he had breached the standard of care in his treatment of her.
Hamilton responded to the summary-judgment motions on October 1, 2010. She conceded that Dr. Isbell was entitled to a summary judgment, stating that she “hereby agrees that the ‘Motion for Summary Judgment on Behalf of Dr. John Blakely Isbell’ is due to be granted and concedes that there is no set of facts that, if proved against Dr. Isbell, would entitle her to recover.” However, she argued that the summary-judgment motions filed by the other defendants should be denied. Specifically, she argued that in Gentry this Court had “based [its decision to deny recovery for the death of a previable unborn child] on the fact that ‘there is no *732 clear legislative direction.’ 613 So.2d at 1244.” Hamilton argued that subsequent legislative actions had provided the courts with that “legislative direction.” Specifically, Hamilton argued that several statutes on abortion enacted since Gentry was decided “provided clear direction indicating that the term ‘minor child’ can include nonviable fetuses.” On the issue of damages for emotional distress, Hamilton argued that the loss of her unborn child was a physical injury that entitled her to recover damages for her emotional distress; alternatively, she argued that she was entitled to damages for emotional distress under Taylor v. Baptist Medical Center, Inc., 400 So.2d 369 (1981), in which this Court permitted a mother to recover damages for emotional distress following the death of her child during birth.
On October 5, 2010, the defendants filed a reply brief in support of their summary-judgment motions. In their reply brief, they argued that “the law in Alabama remains that a plaintiff cannot maintain a wrongful death action for a non-viable fetus and the Alabama legislature has not declared otherwise.” Specifically, the defendants argued that the legislature’s subsequent, abortion-related legislation did not justify overruling Gentry and Lollar. The defendants also argued that, in seeking damages for her emotional distress, Hamilton did “not state a claim upon which relief can be granted” because, they said, she “misinterprets the holding in Taylor ” and her “individual claim is insufficient as a matter of law.”
On October 15, 2010, the trial court granted the defendants’ summary-judgment motions, concluding:
“[Hamilton] has conceded that the defendant, Dr. John Blakely Isbell, is due to be granted summary judgment.
“[Hamilton’s] claims are for wrongful death and for emotional distress suffered by [Hamilton] as a result of being caused to deliver a stillborn child.
“The defendants assert, and the court agrees, that [Hamilton] cannot maintain a wrongful death action for a fetus not viable to live outside the womb. Gentry v. Gilmore, 613 So.2d 1241 (Ala.1993); Lollar v. Tankersley, 613 So.2d 1249 (Ala.1993). The court considers the Gentry and Lollar cases controlling on this issue. The court is unconvinced that statutes passed by the legislature subsequent to those decisions have altered their application. Accordingly, it is adjudged that the defendants’ motion for summary judgment is due to be granted as to the wrongful death claim.
“The defendants also assert that [Hamilton] cannot maintain a claim for emotional distress and mental anguish because she has failed to produce substantial evidence that she sustained a physical injury or was placed in immediate risk of physical harm by the conduct of defendants. [Hamilton] insists that the Alabama Supreme Court’s decision in Taylor v. Baptist Medical Center, Inc., 400 So.2d 369 (Ala.1981), is controlling on this issue. In Taylor, the plaintiffs action against her physician was based on allegations that the physician negligently failed to attend during her labor and her delivery of a child who either was stillborn or died within moments of birth.
“The Supreme Court in Taylor abandoned the ‘physical impact’ test that had been the law up until that point and extended the right to recover to those who suffered emotional distress without also suffering a corresponding physical injury. In a later case, the Supreme Court discussed three tests for evaluating claims alleging negligent infliction of emotional distress that have developed in the common law: the physical impact *733 test; the zone of danger test; and the relative bystander test. It then declared the current state of Alabama law to be consistent with the ‘zone of danger’ test, which limits recovery for emotional injury to those plaintiffs who sustain a physical injury as a result of a defendant’s negligent conduct, or who are placed in immediate risk of physical harm by that conduct. AALAR, Ltd., Inc. v. Francis, 716 So.2d 1141 (Ala.1998). In the AALAR decision, the Court found the decision in the Taylor case to be consistent with that test because it was reasonably foreseeable that the plaintiff would be placed at risk of physical injury by the physician’s failure to attend her delivery.
“Given that the ‘zone of danger’ test is the current state of the law in Alabama, this court concludes that it is the test applicable to [Hamilton’s] claim for emotional distress and mental anguish. To support that claim, [Hamilton] must establish by substantial evidence that it was reasonably foreseeable that she would be placed at risk of physical injury by the defendants’ conduct. The materials submitted to the court in support of and in opposition to defendants’ motions for summary judgment are devoid of any such evidence, and the court finds the evidence insufficient to raise an issue of material fact as to whether the defendants’ alleged breach of care placed [Hamilton] within the ‘zone of danger.’
“[Hamilton] argues that the death of the fetus constituted ‘physical injury’ to her body, thereby entitling her to claim emotional distress and mental anguish. She suggests that the fetus was as much a part of her body as a lung, a kidney, a spleen, an arm, a leg or any other organ. Our Supreme Court, however, has quoted with approval holdings in cases from other jurisdictions that the fetus or embryo is not a part of the mother, but rather has a separate existence within the body of the mother. Wolfe v. Isbell, 291 Ala. 327, 280 So.2d 758 (1973). The death of a fetus does not, without more, constitute a physical injury to the body of the mother, and the court finds as a matter of law that [Hamilton] cannot recover for emotional distress or mental anguish based on such claim.
“In conclusion, the court finds that [Hamilton] cannot maintain a wrongful death claim for the death of a non-viable fetus; she cannot maintain an individual claim for emotional distress because the evidence is insufficient to show that she was within the ‘zone of danger,’ and she cannot claim a physical injury to her body as a result of the death of the fetus. Based on thése conclusions, the court finds it unnecessary to address the issue of causation.
“Accordingly, it is adjudged that the defendants’ motion for summary judgment for all defendants on all claims is granted, and [Hamilton] shall have no recovery against the defendants.”
Hamilton appealed the summary judgment in favor of the defendants other than Dr. Isbell.
After briefing in this case was completed, this Court issued its decision in Mack v. Carmack, 79 So.3d 597 (Ala.2011). In Mack, this Court recognized that a wrongful-death action is available for recovery of damages for the accidental death of a previable unborn child, specifically overruling Gentry and Lollar; in those cases, which the trial court in this case relied upon (see the trial court’s order, quoted supra), this Court had held that damages could not be recovered for the wrongful death of a child who died without being born alive or reaching viability. In Mack, we stated:
*734 “In sum, it is an unfair and arbitrary endeavor to draw a line that allows recovery on behalf of a fetus injured before viability that dies after achieving viability but that prevents recovery on behalf of a fetus injured that, as a result of those injuries, does not survive to viability. Moreover, it is an endeavor that unfairly distracts from the well established fundamental concerns of this State’s wrongful-death jurisprudence, i.e., whether there exists a duty of care and the punishment of the wrongdoer who breaches that duty. We cannot conclude that ‘logic, fairness, and justice’ compel the drawing of such a line; instead, ‘logic, fairness, and justice’ compel the application of the Wrongful Death Act to circumstances where prenatal injuries have caused death to a fetus before the fetus has achieved the ability to live outside the womb.
“In accord then with the numerous considerations discussed throughout this opinion, and on the basis of the legislature’s amendment of Alabama’s homicide statute to include protection for ‘an unborn child in útero at any stage of development, regardless of viability,’ § 13A-6-l(a)(3), [Ala.Code 1975,] we overrule hollar and Gentry, and we hold that the Wrongful Death Act permits an action for the death of a previable fetus. We therefore reverse the summary judgment in favor of Carmack and remand the action for further proceedings consistent with this opinion.”
79 So.3d at 611-12.[4]
Hamilton submitted copies of the Mack decision to this Court as supplemental authority in her appeal, accompanied by a letter asking the clerk of this Court to distribute those copies to the members of the Court. The defendants filed a motion to strike Hamilton’s supplemental authority or, in the alternative, to grant the defendants permission to respond to that supplemental authority. This Court denied the motion to strike, granted the defendants permission to respond to the supplemental authority, and permitted Hamilton to reply to the defendants’ response.

Standard of Review

“ ‘[0]n appeal a summary judgment carries no presumption of correctness,’ Hornsby v. Sessions, 703 So.2d 932, 938 (Ala.1997). ‘ “In review ing the disposition of a motion for summary judgment, we utilize the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact” and whether the mov-ant was entitled to a judgment as a matter of law.’ Ex parte General Motors Corp., 769 So.2d 903, 906 (Ala.1999) (quoting Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988)). ‘Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant.’ Hobson v. American Cast Iron Pipe Co., 690 So.2d 341,
'344 (Ala.1997).”
Harper v. Coats, 988 So.2d 501, 503 (Ala.2008).

*735
Discussion

A.Whether Mack should apply in this case
The defendants present several arguments contending that this Court should not apply our recent holding in Mack in this case, which was pending on appeal when Mack was decided. However, these arguments are inconsistent with Alabama law:
“The general rule is that a case pending on appeal will be subject to any change in the substantive law. The United States Supreme Court has stated, in regard to federal courts that are applying state law: ‘[T]he dominant principle is that nisi prius and appellate tribunals alike should conform their orders to the state law as of the time of the entry. Intervening and conflicting decisions will thus cause the reversal of judgments which were correct when entered.’ Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 543, 61 S.Ct. 347, 85 L.Ed. 327 (1941). See also United States v. Schooner Peggy, 1 Cranch 103, 5 U.S. 103, 2 L.Ed. 49 (1801). Thus, courts are required to apply in a particular case the law as it exists at the time it enters its final judgment:
“ ‘[I]t has long been held that if there is a change in either the statutory or decisional law before final judgment is entered, the appellate court must “dispose of [the] case according to the law as it exists at the time of final judgment, and not as it existed at the time of the appeal.” This rule is usually regarded as being founded upon the conceptual inability of a court to enforce that which is no longer the law, even though it may have been the law at the time of trial, or at the time of the prior appellate proceedings.’
“Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907, 912 (1962) (quoting Montague v. Maryland, 54 Md. 481, 483 (1880)).”
Alabama State Docks Terminal Ry. v. Lyles, 797 So.2d 432, 438 (Ala.2001) (emphasis added). Mack is now controlling precedent on the issue whether “the Wrongful Death Act permits an action for the death of a previable fetus,” Mack, 79 So.3d at 611, and the Court in that case held such an action permissible. Therefore, we will apply Mack in deciding this appeal.

B. Whether Hamilton Can Recover Damages for the Alleged Wrongful Death of Her Stillborn Son

The first substantive issue we must consider is whether the trial court erred in holding that Hamilton could not maintain a wrongful-death action “for the death of [her] non-viable fetus.” As set forth in Mack and as applicable in this case, Alabama’s wrongful-death statute allows an action to be brought for the wrongful death of any unborn child, even when the child dies before reaching viability. Applying our holding in Mack, quoted supra, we conclude that the summary judgment, insofar as it held that damages for the wrongful death of a previable unborn child were not recoverable, must be reversed and the case remanded for the trial court to reconsider the defendants’ summary-judgment motions in light of this Court’s holding in Mack; the trial court may conduct such proceedings as it deems necessary in reconsidering those motions.

C. Whether Hamilton Can Recover Damages for Emotional Distress

The second issue raised in this appeal is whether the trial court erred in holding that Hamilton “[could not] maintain an individual claim for emotional distress because the evidence is insufficient to show *736 that she was within .the ‘zone of danger,’ and she cannot claim a physical injury to her body as a result of the death of the fetus.”
In their summary-judgment motions, the defendants argued that Hamilton could not recover damages for emotional distress because, they said, Hamilton “was not physically injured as a result of the defendants’ alleged conduct” and Hamilton “was never in the ‘zone of danger.’ ” In support of this argument, the defendants cited AALAR, 716 So.2d at 1148, in which this Court stated that it “has not recognized emotional distress as a compensable injury or harm in negligence actions outside the context of emotional distress resulting from actual physical injury, or, in the absence of physical injury, fear for one’s own physical injury.” (Citing Pearson, Liability to Bystanders for Negligently Inflicted Emotional Harm — A Comment on the Nature of Arbitrary Rules, 34 U. Fla.L.Rev. 477, 487 (1982)). The defendants noted that, during her deposition, Hamilton testified that she had not been “concerned for [her] life.”[5]
In her response to the defendants’ summary-judgment motions, Hamilton stated that she “[did] not dispute that she never feared for her own life and is therefore not entitled to zone of danger damages.” However, Hamilton claimed that she is “entitled to mental anguish damages” under this Court’s decision in Taylor v. Baptist Medical Center, supra. Hamilton argued that Taylor “carve[d] out a specific exception” to the zone-of-danger test for cases in which a mother has suffered the loss of her unborn child. However, in AALAR, this Court explained that the test this Court had been applying with regard to claims for emotional-distress damages, including the test applied in Taylor, was “consistent with the ‘zone of danger’ test discussed in [Consolidated Rail Corp. v.] Gottshall, [512 U.S. 532 (1994) ].” 716 So.2d at 1147. In Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), the United States Supreme Court stated that “the zone of danger test limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant’s negligent conduct, or who are placed in immediate risk of physical harm by that conduct.” 512 U.S. at 547-48. Hamilton’s assertion that Taylor “carve[d] out a specific exception” to the zone-of-danger test is erroneous.
The only physical harm Hamilton alleged in her response to the defendants’ summary-judgment motions was the death of her unborn son. She argued that her unborn son was a part of her body; thus, she said, his death was a physical injury to her that allows her to recover damages for emotional distress. We reject that argument, however, because it is incompatible with this Court’s holding in Wolfe v. Isbell, 291 Ala. 327, 330-31, 280 So.2d 758, 761 (1973), in which we said “that from the moment of conception, the fetus or embryo is not a part of the mother, but rather has a separate existence within the body of the mother.”[6]
Because Hamilton conceded that she was “not entitled to zone of danger damages” and her argument suggesting that Taylor created an exception to the zone-of-danger test is misplaced, and because, in response to the defendants’ summary- *737 judgment motions, she presented no evidence showing that she suffered a physical injury as a result of the defendants’ actions, we conclude that the trial court properly entered a summary judgment insofar as it concerns Hamilton’s claim for damages for emotional distress.

Conclusion

Based on our recent holding in Mack, we conclude that Hamilton was entitled to pursue a claim against the defendants for the wrongful death of her unborn son. Thus, as to Hamilton’s wrongful-death claim, we reverse the trial court’s summary judgment in favor of all the defendants except Dr. Isbell, as to whom Hamilton has not appealed, and we remand the case for further proceedings consistent with this opinion. However, because Hamilton failed to demonstrate that she was entitled to damages for emotional distress, we affirm the summary judgment for the defendants — other than Dr. Is-bell — insofar as it denied Hamilton’s claim for such damages.
APPLICATION OVERRULED; OPINION OF FEBRUARY 17, 2012, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MALONE, C.J., and WOODALL, STUART, BOLIN, MURDOCK, SHAW, MAIN, and WISE, JJ., concur.
PARKER, J., concurs specially.

. In accordance with the standard of review in an appeal from a summary judgment and as noted in the "Standard of Review” section of this opinion, we have reviewed the record in the light most favorable to Hamilton, the nonmovant; the facts regarding Hamilton’s pregnancy and treatment are presented in light of that standard. Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).

. In her complaint, Hamilton stated that she was bringing "this action pursuant to [the Wrongful Death Act] as well as the provisions the Medical Liability Act of 1987, as amended, Ala.Code § 6-5-540 et seq. (1975).” The defendants also cited the Alabama Medical Liability Act ("the AMLA”) in their answer and in their motions for a summary judgment. Hamilton does not dispute the applicability of the AMLA to this, case; indeed, in her reply brief, Hamilton acknowledged that "claims against healthcare providers, whether in contract or tort, are now subsumed into one action by the Alabama Medical Liability Act.” Hamilton’s reply brief, at 6.

. The defendants also argued in their summary-judgment motion that Hamilton had failed to prove that the death of her son was caused by the defendants. Hamilton responded to that argument, and the defendants raised it again in their reply brief to the trial court. However, the trial court's order made no factual determination regarding causation; therefore, the issue of causation is not before this Court. For that reason, we do not discuss causation issues in this opinion.

. Additionally, we note that this Court’s holding in Mack is consistent with the Declaration of Rights in the Alabama Constitution, which states that "all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness.” Ala. Const.1901, § 1 (emphasis added). These words, borrowed from the Declaration of Independence (which states that "[w]e hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness”), affirm that each person has a God-given right to life.

. Specifically, during her deposition, Hamilton was asked, "I mean, at any time in this process, were you ever concerned for your life?” Hamilton answered, “I was not concerned for my life.”

. In their brief on appeal, the defendants cite Wolfe for this same proposition. See defendants' brief, at 40